IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO

_____

JACOB E. WIDEMAN,
*Petitioner/Appellant*,

*v.*

ARIZONA DEPARTMENT OF CORRECTIONS AND
ARIZONA BOARD OF EXECUTIVE CLEMENCY,
*Respondents/Appellees*.

No. 2 CA-CV 2023-0292
Filed July 30, 2026

_____

Appeal from the Superior Court in Maricopa County
Nos. LC2018000461001DT and LC2023000053001DT
The Honorable Mark H. Brain, Judge

**AFFIRMED**

_____

COUNSEL

Law Office of Hernandez Hamilton Lamoureux PC, Tucson
By Carol L. Lamoureux and Joshua F. Hamilton
*Counsel for Petitioner/Appellant*

Struck Love Acedo PLC, Chandler
By Daniel P. Struck, Jacob B. Lee, and Nicholas Acedo
*Counsel for Respondent/Appellee Arizona Department of Corrections,*
*Rehabilitation & Reentry*

Kristin K. Mayes, Arizona Attorney General
By Kelly Gillilan-Gibson, Assistant Attorney General, Phoenix
*Counsel for Respondent/Appellee Arizona Board of Executive Clemency*

---

**OPINION**

---

Chief Judge Staring authored the opinion of the Court, in which Presiding Judge Brearcliffe concurred and Judge Eckerstrom dissented.

---

S T A R I N G, Chief Judge:

**¶1**         Jacob Wideman appeals from the superior court's denial of his second special action complaint seeking relief from his arrest by the Arizona Department of Corrections, Rehabilitation, and Reentry ("the Department") and the revocation of his home arrest by the Arizona Board of Executive Clemency ("the Board"). For the following reasons, we affirm.

**Factual and Procedural Background**

**¶2**         In August 1986, Wideman murdered E.K. by stabbing him twice in the chest with a knife while he slept.[1] The two, both sixteen at the time, were participating in an organized youth tour of the western United States and were roommates at a Flagstaff hotel. Wideman had woken up that night with an "impulse" to take E.K.'s life; he had experienced similar violent impulses since he was "six or seven years old." After murdering E.K., Wideman fled the scene, taking traveler's checks and the group's car. He traveled across the country and eventually turned himself in.[2] After pleading guilty to first-degree murder, Wideman was sentenced to life imprisonment with the possibility of parole after twenty-five years.

**¶3**         Wideman first became eligible for parole consideration in 2011. The Board denied his first six requests. In September 2016, the Board held a parole hearing.[3] It heard from Wideman, his supporters, and those

---

[1]The facts of the underlying murder are taken from Wideman's testimony at his parole hearing.

[2]In October 1986, while staying at a Boston mental health facility, Wideman was accused of attempting to strangle another teen residing at the facility. The charges were dismissed when the detective investigating the incident determined that it was a matter of roughhousing gone too far.

[3]At this hearing, the Board noted that Wideman had been put on mental health watch while imprisoned ten times, many of which

opposing his release, including E.K.'s father. At that time, Wideman promised that he would continue counseling with Dr. Jon McCaine, a psychologist who had worked with him while he was in prison. Wideman's family paid for McCaine's services while Wideman was imprisoned, and they indicated they would continue to help with those expenses if he was released. In his release plan, Wideman wrote: "Dr. McCaine and I have already had three counseling sessions, . . . and we are developing an excellent working relationship. I look forward to continuing to work with him throughout the transition process and afterward." He also attached a letter from McCaine concerning their meetings, and, in it, McCaine offered his conclusions after their most recent session in August 2016. Specifically, McCaine wrote:

> This visit suggested continuity is beginning to develop where one meeting draws on the prior meeting. This type of thematic continuity is an essential cornerstone for ongoing therapeutic interactions in the service of personal growth and development. Mr. Wideman reiterated his intention to continue these sessions with future meetings contingent on the outcome of his next parole board hearing.

¶4 Wideman was released to home arrest in November 2016. Upon release, Wideman asked his parole officer about arranging counseling appointments with Dr. McCaine. The decision on whether Wideman would see McCaine "was placed on hold" because, "as a matter of course," the Department first refers inmates to Correctional Healthcare Companies (CHC) for counseling, and "it was recommended . . . that [Wideman] not have two separate counselors . . . at the same time." Wideman completed a CHC screening and attended a second session during which he was approved for employment. Wideman thereafter attended weekly individual sessions for three months and then transitioned to weekly group sessions for nearly four months afterward. On June 11, 2017, Wideman "successfully completed all exercises and met treatment goals associated with this program and was discharged successfully."

¶5 On May 4, 2017, Wideman appeared before the Board for a status hearing. At that hearing, Wideman's counsel stated that Dr. McCaine

___

corresponded with the receipt of bad news, such as the denial of a parole request.

was still "ready to start working with [Wideman]" and that Wideman had "the payment taken care of." The Board voted to continue Wideman on home arrest "with same conditions." On June 22, Wideman's parole officer, Patrick Pogue, called Wideman and instructed him to contact McCaine "within the next week to schedule an appointment for therapy." On June 27, Pogue contacted Wideman's wife to inquire whether she had any questions or concerns. Pogue asked her if Wideman had "reached out to Dr. McCain[e] yet. [She] reported that [Wideman] may not be able to afford the services with Dr. McCain[e]" and was "planning on discussing other options with" Pogue.

¶6        On June 28, Pogue visited Wideman and asked if he had made contact with Dr. McCaine. Wideman said he "was going to check to see how much it would cost as he believed Dr. McCaine charges approx[imately] $200-$400 per hour," which "he would likely not be able to afford." Despite assuring the Board less than two months earlier that payment for McCaine's services had been "taken care of," Wideman now asked if the Department would help subsidize the cost. Pogue "did not believe that would be an option" but said he would "staff the issue."

¶7        On June 29, after waiting the full week Pogue had given him to initiate contact, Wideman emailed Dr. McCaine. The email did not ask about McCaine's fees but expressed an interest in "resum[ing] a counseling relationship" and asked about McCaine's schedule. On July 5, McCaine responded, inquiring whether Wideman had insurance coverage and requesting that Wideman give him a call to schedule a formal intake. Wideman subsequently spoke with his supervisor at work about attending sessions with McCaine during regular business hours, but his supervisor expressed doubt that the business could "afford to have [him] miss that much work, especially if [he] wanted to . . . continue on a promotion track."[4] At that time, Wideman was working as a customer service representative at 24/7 In Touch in Mesa, Arizona, requiring a more than two hour commute each direction using public transportation, earning $12 an hour.

¶8        On July 6, Pogue asked Wideman if he had learned how much Dr. McCaine charged. Wideman indicated he had contacted McCaine and, according to the chronology notes, said he would contact him again that

---

[4]Relatedly, CHC counselor Carole Coughlin, after meeting Wideman for the first time, expressed concern that he would "use work as an excuse to not attend individual [counseling] sessions."

day or the next. (However, Wideman later disputed having promised to do so at the revocation hearing and accordingly testified he did not call McCaine on July 6 or 7.) Wideman again expressed doubt to Pogue that he could afford McCaine's services, but he said he would "start receiving insurance benefits" through his employer "in the next few weeks and that might help pay for some of the cost." Wideman also asked about "continu[ing] classes with CHC as a financial alternate," noting that, "due to employment hours," weekend classes, which CHC offers, were "best." Pogue again said CHC "would be looked into."

¶9　　　　On July 12, community corrections officer James Berg visited Wideman. Wideman reported that he had called Dr. McCaine, learned his fees were $300 per session, and was "waiting to hear back" if insurance could reduce those fees. (However, there is no other evidence of this call in the record, and McCaine later testified that he charged only $150 per session.) Wideman reiterated to Berg that he would receive insurance through his work after ninety days of employment, which he had almost attained, but again stated, "I don't really think I am going to be able to afford Dr. McCaine and will probably have to go back to CHC."

¶10　　　　On July 17, Pogue asked Wideman if he was going to attend counseling with Dr. McCaine. Wideman said he would "rather attend more CHC classes" as McCaine's "fees were more than he could afford." He also reported he did not believe McCaine could see him on weekends, although McCaine had previously visited Wideman on a Saturday. Pogue asked if Wideman was "going to set up an intake assessment with Dr. McCaine or not." Wideman replied he would call on July 18 to do so.

¶11　　　　On July 18, Wideman called Dr. McCaine's office twice using the direct line to McCaine's office, "which nobody answers except" McCaine. When no live person answered, he left a voicemail. Immediately afterward, Wideman called Pogue to report that he had called McCaine and that he would "wait to hear back from Dr. McCaine and continue to try to set up the appointment." Pogue allegedly responded, "Perfect," but there is no indication he was aware Wideman had called McCaine's direct line, as Wideman "reported he contacted Dr. McCaine's office." The next day, during a visit at Wideman's home, Pogue asked if he had heard back from McCaine's office, to which Wideman reportedly responded that "he had not," reiterating that "he did not have the financial means to pay for" McCaine's services, but this time explaining that he had used the money saved for counseling to pay for unspecified "other things."

¶12 Holly Dorman, Pogue's supervisor, issued a warrant for Wideman's arrest on July 24. The warrant indicated Wideman had violated Condition of Supervision Number Two, "as demonstrated by his failure to follow the directives of his assigned parole officer by failing to schedule an intake assessment with Dr. Jon McCaine, a licensed psychologist, on or about 07/18/2017, as verbally directed on 07/17/2017 by" Pogue. On July 25, pursuant to the warrant, the Department arrested Wideman and returned him to custody.

¶13 In August 2017, the Board conducted a revocation hearing in two phases. During Phase I, the Board heard testimony from Wideman contesting that he had violated his release conditions. Over Wideman's objection, the Board also heard recorded testimony from Dorman. She testified that she had issued the warrant because, although Wideman insisted he would resume a counseling relationship with Dr. McCaine after his release, Wideman failed for about three weeks to schedule an appointment. This led Dorman to believe he was "trying to avoid" treatment. The Board concluded Phase I by finding Wideman had violated his conditions of supervision. The Board then conducted Phase II, after which it unanimously revoked Wideman's home arrest.

¶14 In November 2018, Wideman filed a petition for special action challenging the actions of the Department and the Board (collectively, "the state"). Wideman argued, among other things, that the Department had lacked reasonable cause to issue the warrant and that the warrant did not articulate facts indicating Wideman was about to lapse into criminal ways or conduct. Wideman also asserted that the Board had failed to hold a preliminary hearing on the warrant; that the Board had admitted undisclosed, unsworn videotaped testimony of Dorman, which prevented cross-examination; that the Board's findings were not established by a preponderance of the evidence; and that the Board had failed to issue a written statement.

¶15 In July 2019, the superior court accepted jurisdiction and granted relief on grounds that the state had failed to conduct a mandatory preliminary hearing and had deprived Wideman of due process by introducing videotaped testimony of Dorman that was not subject to cross-examination. The court vacated the revocation decision and remanded to the Board for further proceedings.

¶16 In September 2019, the Board held a preliminary hearing to determine if probable cause existed to issue the warrant. After considering the testimony, the notes written by the parole officers, the email

correspondence and phone records, and "the totality of the circumstances," the hearing officer determined there was probable cause that Wideman had violated a condition of his release by failing to follow his parole officer's directive to make an appointment with Dr. McCaine and "may have lapsed into criminal ways."

¶17            In January 2020, the Board held the second revocation hearing. The Board indicated it would consider only evidence submitted at the first revocation hearing, excluding the videotaped testimony of Dorman. Based on the information in the warrant and the testimony presented at the hearing, the Board found that Wideman had "violated the terms and conditions of his supervision" and "that he may have lapsed or was about to lapse into criminal ways." The Board then voted to revoke Wideman's home arrest again.

¶18            In December 2022, Wideman filed a second special action. As to the Department, Wideman re-raised his argument that the warrant was defective. As to the Board, Wideman argued the hearing officer at the preliminary hearing had prevented Wideman from cross-examining Dorman and had made no finding that Wideman lapsed into criminal ways. Wideman also asserted the Board had violated his right to due process at the second revocation hearing by interrupting his cross-examination of Pogue, had violated Arizona law and its own policy by failing to find, based on specific facts, that he lapsed or was probably about to lapse into criminal ways, and had failed to provide a written statement identifying the evidence it relied upon in revoking his release. Wideman further maintained that the Board's revocation was void because three of the Board's members were from the same professional discipline in violation of A.R.S. § 31-401(B).

¶19            In October 2023, the superior court accepted jurisdiction of Wideman's second special-action petition but denied relief. This appeal followed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 12-2101(A)(1). *See* Ariz. R. P. Spec. Act. 4(c); 10(c).

## Discussion

¶20            Wideman argues the superior court erred by failing to conclude that (1) the Board had violated his right to due process by its conduct during the preliminary and the second revocation hearings, (2) the Board acted arbitrarily and capriciously in finding grounds to revoke his home arrest, and (3) the Board's membership impermissibly contained

people of the same profession.[5]  He also argues the warrant the Department issued was defective because (1) it failed to articulate specific facts supporting the lapse prong of A.R.S. § 31-415, and (2) Dorman, as community corrections manager, lacked the authority to issue the warrant because she did not fall within any of the offices empowered to do so under § 31-415.

**¶21**      We review the superior court's denial of relief in this special action for an abuse of discretion.  *Hormel v. Maricopa County*, 224 Ariz. 454, ¶ 16 (App. 2010).  A court abuses its discretion when its decision is unsupported by the record or it commits an error of law.  *Shinn v. Ariz. Bd. of Exec. Clemency*, 254 Ariz. 255, ¶ 13 (2022).  Section 31-402(A), A.R.S., grants the board the "exclusive power to pass on and recommend . . . paroles."  This grant of authority precludes this court from substituting its view of the facts for that of the Board and from reweighing the merits of parole board decisions.[6]  *Cooper v. Ariz. Bd. of Pardons & Paroles*, 149 Ariz. 182, 184 (1986); *Stewart v. Ariz. Bd. of Pardons & Paroles*, 156 Ariz. 538, 540 (App. 1988).  Review by special action of the parole board's decisions is thus narrowly confined to determining whether a parolee has been denied due process during revocation proceedings or whether the board has exceeded its legal authority.  *Broadhead v. Ariz. Bd. of Pardons & Paroles*, 151 Ariz. 37, 40 (App. 1986), *disapproved on other grounds by Kelley v. Ariz. Dep't of Corr.*, 154 Ariz. 476, 479-80 (1987).

**¶22**      As a preliminary matter, we decline to address Wideman's warrant challenges.  He raised these challenges in the first special action, in

---

[5]Wideman also contends that to "correct the due process violations" we should consider "vacating [the Department's] invalid warrant and [the Board's] revocation decision and order that Wideman be released back on home arrest."  Because we have found that no due process violation occurred, it is unnecessary to address this claim.  However, we reiterate that the proper remedy for a due process violation in connection with parole revocation proceedings is ordering a new hearing, not ordering release.  *See Long v. Ariz. Bd. of Pardons and Parole*, 180 Ariz. 490, 495 (App. 1994).  We are aware of no authority that, on the record before us, would support this court ordering Wideman's release.

[6]Distilled to its essence, our colleague's dissent reflects an expansive view of this court's role in reviewing board decisions.  Although couched in terms of due process, much of it amounts to reweighing the evidence. *See Stewart v. Ariz. Bd. of Pardons & Paroles*, 156 Ariz. 538, 540 (App. 1988).

which the superior court remanded for the Board to conduct a preliminary hearing but expressly denied Wideman's requested relief of vacating the warrant. Wideman did not appeal that ruling. Wideman nevertheless contends that his failure to appeal did not result in waiver of the warrant claim, reasoning that the superior court in the first special action "declined to resolve" the claim directly by ordering a preliminary hearing at which challenges to the sufficiency of the warrant could be heard. Wideman misinterprets that ruling. Although the court noted that the warrant lacked information pertaining to lapse, it did so in the context of analyzing whether the lack of a preliminary hearing prejudiced Wideman by depriving him of notice of the evidence against him. The court expressly denied the warrant claim, and Wideman did not seek review of that ruling. Therefore, this claim is not properly before us.[7] *See* Ariz. R. P. Spec. Act. 10(c) (Arizona Rules of Civil Appellate Procedure apply to special actions); Ariz. R. Civ. App. P. 9(a) (providing thirty days to file appeal from entry of judgment).

## I.  Due Process During Revocation Proceedings

**¶23**        The Due Process Clause of the Fourteenth Amendment protects a parolee's interest in his continued liberty such that revocation requires "some orderly process, however informal."[8] *Morrissey v. Brewer*, 408 U.S. 471, 481-84 & 482 (1972); *see also* U.S. Const. amend. XIV, § 1; *Broadhead*, 151 Ariz. at 40. Still, revocation of parole is not part of a criminal prosecution, and thus a parolee does not enjoy the "full panoply" of due process rights afforded a criminal defendant.[9] *Morrissey*, 408 U.S. at 480,

---

[7]The warrant met the requirements imposed by the Arizona Administrative Code. *See* A.A.C. R5-4-302(A) (requiring warrant to "allege[] an inmate violated a condition of the inmate's release" and "list[] documents and items to be offered as evidence and witnesses who will be called to testify"). Notably, § 31-415 is largely silent as to the warrant's required contents, mandating only that it specify the date of "expiration of the maximum sentence or term of community supervision," which the warrant at issue here did.

[8]A home arrestee, though an inmate, is entitled to "due process rights of return." A.R.S. § 41-1604.13(F).

[9]For example, "the process should be flexible enough to consider evidence . . . that would not be admissible in an adversary criminal trial." *Morrissey*, 408 U.S. at 489.

482. The informal process must include two hearings: a preliminary hearing and a revocation hearing. *Id.* at 485-89; *Broadhead*, 151 Ariz. at 40.

## A. The preliminary hearing

¶24 The purpose of the preliminary hearing is to determine whether probable cause or reasonable grounds exist to believe that the arrested parolee has violated the terms of parole. *Broadhead*, 151 Ariz. at 40; *Morrissey*, 408 U.S. at 485. The parolee must be provided an opportunity to appear at the hearing and to present relevant witnesses or documentary evidence. *Broadhead*, 151 Ariz. at 40. Upon request, those who have given adverse information about the parolee must be made available for questioning in the parolee's presence. *Morrissey*, 408 U.S. at 487. Hearing officers employed by the board's executive director preside over preliminary hearings. *See* § 31-402(G). A hearing officer must exercise control over the hearing to prevent "delaying tactics and other abuses." *Morrissey*, 408 U.S. at 490. The hearing officer must also summarize what occurred at the hearing, including the parolee's responses and the substance of the evidence relied on, but formal findings of fact and conclusions of law are not required. *Id.* at 487. If the hearing officer finds "reasonable grounds to believe a violation occurred," the parolee may be re-incarcerated pending the final decision of the board on revocation. *Broadhead*, 151 Ariz. at 40.

¶25 At Wideman's preliminary hearing, the hearing officer allowed his counsel to cross-examine Dorman, the officer who had managed Wideman's case on parole and issued the warrant. Dorman answered questions regarding CHC counseling, the July 17 instruction, and the warrant. However, the hearing officer limited questions unrelated to the alleged violation, explaining that whether Wideman "followed the directives of his" parole officer was his primary concern during the hearing. After the hearing, the hearing officer provided a written summary, noting in the findings section that he found "probable cause that Mr. Wideman violated a condition of his release" based on "the testimony from all parties involved, submitted attachments related to phone records, Chrono notes, emails, and the totality of the circumstances."

¶26 Wideman argues that the hearing officer deprived him of due process by determining that probable cause existed in the absence of any evidence that Wideman had lapsed or probably would lapse into criminal ways or company. He further contends that the hearing officer deprived him of his due process right to confront and cross-examine adverse witnesses by limiting questions unrelated to the alleged violation.

¶27          The preliminary hearing satisfied the due process requirements set forth in *Morrissey*.  *See* 408 U.S. at 485, 487.  Contrary to Wideman's assertion, due process only required the hearing officer to determine whether there was probable cause to believe a violation had occurred—not whether Wideman had lapsed or was about to lapse.  *See Broadhead*, 151 Ariz. at 40 ("If reasonable grounds to believe a violation occurred are found after a proper hearing, the parolee may be re-incarcerated pending the next stage, the revocation hearing.").  The hearing officer met this standard by identifying the evidence supporting his conclusion that Wideman had "violated a condition of release" when he failed to follow the "directive . . . to make an appointment with Dr. McCaine."  Thus, the alleged absence of lapse evidence did not result in a deprivation of Wideman's due process rights.[10]

¶28          Moreover, Wideman was afforded the opportunity to cross-examine Dorman and to challenge the evidence supporting a finding that he violated a condition of his release.  The hearing officer merely restricted questioning that fell outside the scope of the alleged violation, which was consistent with the limited purpose of a preliminary hearing and the hearing officer's duty to control the proceeding.  *See Morrissey*, 408 U.S. at 485, 490.  Accordingly, the superior court did not abuse its discretion in concluding that Wideman had failed to demonstrate a basis for relief as to his claim that the preliminary hearing officer deprived him of due process.

## B.  The second revocation hearing

¶29          As noted, Wideman also asserts the Board violated his right to due process at the second revocation hearing by interrupting his cross-examination of Pogue, by finding lapse in Phase I without evidentiary support, by failing to consider whether a sanction short of reimprisonment would be sufficient to address the violation, and by failing to make sufficient written findings identifying the evidence relied upon in revoking his release.

---

[10]Further, what constitutes lapse evidence in the case of Wideman? He is not a pedophile who might be observed watching a playground. Neither is he a bank robber who might be observed surveilling a bank. Wideman brutally murdered E.K. in private in order to satisfy his recurring impulses to kill.  The Board could reasonably find evidence of lapse in his repeated failures to pursue continuing counseling with Dr. McCaine.

¶30 The purpose of the revocation hearing is to reach "a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation." *Broadhead*, 151 Ariz. at 41-42 (quoting *Morrissey*, 408 U.S. at 488). If the Board finds the parolee delinquent after a hearing, it may revoke parole and recommit the parolee to prison. A.R.S. § 31-417. "Delinquent" in this context refers to the "two prong standard of A.R.S. § 31-415," *Broadhead*, 151 Ariz. at 43-44, which requires proof "that a paroled prisoner . . . has violated his parole . . . and has lapsed or is probably about to lapse into criminal ways," § 31-415. The minimum requirements of due process at this stage include:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body . . . ; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Morrissey*, 408 U.S. at 489.

¶31 Board policy explains that revocation hearings are conducted in two phases. Ariz. Bd. of Exec. Clemency, Board Policy # 111 (Revocation Hearings), 111.2.2 (2019). During Phase I, the board should consider the allegation in the warrant and related information. *Id.* at 111.2.3. "If the Board determines that the offender violated the terms and conditions of supervision, was delinquent and has lapsed or is probably about to lapse into criminal ways or company, then the Board will move to Phase II." *Id.* at 111.2.4(b). In Phase II, after considering testimony and materials provided by the inmate and other interested parties, the board may revoke parole or continue the offender on parole with or without additional conditions. *Id.* at 111.2.5; *see also* A.A.C. R5-4-302(D).

¶32 Phase I of the second revocation hearing began with a reading of the allegation in the arrest warrant, which Wideman stated was false. Pogue then read the accompanying violation report, and Wideman was given an opportunity to respond. However, when the topic of Wideman's testimony veered away from the warrant, the Board interjected, explaining

that such subjects would be covered in Phase II. The Board then moved to find that Wideman had violated the terms of his parole and that he lapsed or was about to lapse into criminal ways. Wideman's counsel objected, asserting that Wideman was entitled to cross-examine Pogue before that finding could be made. The Board stated that Wideman would have an opportunity to cross-examine Pogue during Phase II and that the purpose of Phase I was to determine whether a condition had been violated. The Board added that, in Phase II, Wideman would have "ample time to . . . convince [the Board] that there isn't a reason to revoke the parole."

¶33 Still, the Board vacated the motion and allowed a limited cross-examination of Pogue. When Wideman's counsel asked Pogue about the other programs CHC offers, the Board again interjected, explaining that in Phase I the Board was not considering "what other counseling options might have been available." However, the Board noted that the availability of alternative counseling "might be something that would be consider[ed] in deciding whether or not [Wideman] should be returned to supervision or have his parole revoked." After Wideman's counsel indicated that she had no more questions for Pogue related to the allegation in the warrant, the Board commenced its own questioning of Pogue. Pogue explained that it was Wideman who had selected Dr. McCaine, that he had directed Wideman to schedule an appointment "probably six times," and that he considered counseling to be a "key component of [Wideman's] release"—a fact highlighted by Wideman in his own release plan. The Board then allowed Wideman to respond and asked him several follow-up questions, during which Wideman confirmed that, as of June 28, he "knew that it was an expectation that [he] schedule an appointment with Dr. McCaine," but pushed back on "the idea that there was . . . a standing order" to do so given that he was waiting for an update on CHC from Pogue. The Board then adopted a motion finding that Wideman had "violated the terms and conditions of his supervision" and "may have lapsed or was about to lapse into criminal ways" and proceeded to Phase II.

¶34 Phase II began with Wideman's testimony. When asked whether his assertions, in his release plan, regarding his relationship with Dr. McCaine had an "influence" on the Board when it granted him parole, Wideman responded, "Yes, absolutely." However, he maintained that he could not obtain counseling with McCaine after completing CHC programming due to a change in "life circumstances." He also denied making a statement at his first release hearing that he still experienced "violent mental images" accompanied by a "rush of emotion," explaining

that he would experience similar, intense "emotional energy" about "three times a year," but that he was able to deal with that energy.

¶35        Dorman testified next.   She explained that Wideman's work-related justifications for not attending therapy with Dr. McCaine, with whom Wideman insisted he had an established relationship, coupled with CHC counselor Carole Coughlin's concern that Wideman would use work as an excuse to not attend counseling, led her to believe that Wideman was about to lapse into criminal ways.  She further testified that it is her job to use her education, training, and experience to "identify when people are . . . stepping into risk factors that lead to . . . reoffending" and that she is not required to wait for a parolee to cause harm before issuing a warrant.  The hearing proceeded with Wideman's cross-examination of Dorman, during which she answered questions regarding Wideman's initial request to see McCaine, Wideman's compliance with other directives, her decision to withhold information pertaining to the availability of CHC programming due to public safety concerns, the availability of alternative counseling, her conversations about Wideman with the Department's director, and Wideman's counseling with Coughlin.   The Board interrupted the cross-examination only twice[11] to express concern that the respective question exceeded the scope of Dorman's personal knowledge, and both times Wideman's counsel was permitted to clarify the reasoning behind the questions before proceeding.   The Board also permitted Wideman to cross-examine Pogue, who, without interruption, answered questions regarding Wideman's compliance with other directives and positive evaluations from Wideman's employers and other associates.

¶36        After hearing from the interested members of the public, including Wideman's mother and sister, the Board moved on to the parties' closing statements.  During her closing statement, Wideman's counsel claimed that the Department had intentionally misled Wideman as to the availability of CHC programs to create a violation where there was none. She additionally reminded the Board that it could "reinstate the inmate's release with or without additional conditions" and emphasized Wideman's compliant record while on parole.  During Wideman's closing statement, he accused the Department of deliberate deception, based on Dorman's testimony, and emphasized his record while on parole.

---

[11]There was one other interruption seemingly because a spectator tried to take a photograph.

¶37 The Board then made oral findings on the record, during which it acknowledged Wideman's largely compliant behavior but explained the need to balance that against the heinous nature of the killing and the other facts of the case. It found that Wideman's failure to schedule an appointment with Dr. McCaine raised a significant concern that Wideman would "commit another crime" given the emphasis placed on the relationship between the two in Wideman's original release plan. It also found Dorman's testimony "very credible" given her "significant experience and training," while expressing doubts about Wideman's justifications for not scheduling an appointment. Specifically, it noted cost was not raised as an issue when Wideman assumed the obligation of attending counseling with McCaine, and it deemed Wideman's alleged belief that CHC remained a viable option unreasonable given Pogue's repeated requests to schedule an appointment with McCaine. Emphasizing that continued counseling was a "critical condition of his . . . release," the Board found that Wideman should have taken a more "proactive . . . approach" to scheduling an appointment. It subsequently voted to revoke Wideman's parole, finding he was delinquent, had violated the conditions of his release, and had lapsed or was probably about to lapse into criminal ways.

¶38 As noted, with respect to Phase I, Wideman argues that the Board violated its own policies and deprived him of his due process right to "confront adverse witnesses against him" by "cutting off" his attempts to cross-examine Pogue about "subjects relevant to the lapse inquiry." He further contends that the Board's finding of lapse during Phase I was "lacking in evidentiary support" and "violated due process" because it was made before any lapse evidence was presented.

¶39 These arguments, however, discount Phase II of the hearing, during which these alleged deficiencies were adequately addressed. While the Board initially curtailed Wideman's cross-examination of Pogue on the ground that the sole purpose of Phase I was to discuss the "directive and the violation," contradicting its own policy,[12] *see* Ariz. Bd. of Exec. Clemency, Board Policy # 111 (Revocation Hearings), 111.2.4(b), the Board allowed Wideman to cross-examine Pogue without interruption during Phase II. Further, the Board permitted a lengthy cross-examination of

---

[12]Although an administrative agency must follow its own rules and regulations, *Clay v. Ariz. Interscholastic Ass'n*, 161 Ariz. 474, 476 (1989), the Board complied with the relevant regulation here, *see* R5-4-302(D).

Dorman, and its two interruptions during that examination were reasonable in light of the Board's duty to control the proceeding. *See Morrissey*, 408 U.S. at 490. Thus, we cannot say that the Board deprived Wideman of his right to confront adverse witnesses against him.

¶40 Although the Board found Wideman "may have lapsed" in Phase I before the evidentiary record was fully developed, it also found that Wideman "had lapsed" in Phase II. The second finding was made after the Board had heard Dorman's extensive lapse testimony and was based, in part, on that testimony. We cannot say the Phase I finding of lapse violated due process when the subsequent Phase II finding was adequately supported by the evidence. Wideman counters that the presentation of lapse evidence and subsequent finding of lapse in Phase II was meaningless in light of the Board's Phase I finding. But given the Board's statements that they were only considering the evidence of the directive and violation during Phase I, Wideman retained a meaningful opportunity to challenge the state's lapse evidence in Phase II.

¶41 With respect to Phase II, Wideman argues the Board failed to provide an adequate hearing because it "never conducted the required Phase II inquiry of determining whether a sanction short of re-imprisonment would be sufficient." Additionally, he contends that the Board's written statement identifying the evidence relied on and the reasons for revoking parole was insufficient because it "lacked meaningful information regarding the basis for its revocation decision."

¶42 Again, we find these arguments unpersuasive. First, although "reinstat[ing] the inmate's release with or without additional conditions" is one of several actions the Board may take at the close of a revocation hearing, R5-4-302(D), the Board correctly points out that none of the authorities cited by Wideman require it to make express findings regarding its consideration of lesser sanctions. Wideman suggests that the Board's adherence to Arizona's open meeting laws gives rise to such a requirement, but we do not interpret those laws to require the Board to provide an itemized accounting of every legally available alternative it declined to pursue. *See* A.R.S. § 38-431.01 (meeting recording or minutes shall include "accurate description of all legal actions proposed, discussed or taken"). In any event, the record demonstrates that the Board was aware of its ability to impose a sanction other than reimprisonment. Indeed, during Phase I, the Board explained that it was "deciding whether or not [Wideman] should be returned to supervision or have his parole revoked,"

and Wideman's counsel reminded the Board of its ability to impose lesser sanctions before it made its final decision.

**¶43**       Second, we disagree that the written statement was insufficient. It included as a finding, "The Board has found that you violated the terms and conditions of your supervision, that you were deli[n]quent and had or may have lapsed into criminal ways or company based on: info contained in the warrant [and] oral findings on the record." Despite the statement's brevity, the warrant (and accompanying violation report) and the oral findings on the record contain extensive information pertaining to the violation and the findings of lapse and delinquency, belying the claim that the statement failed to provide meaningful information regarding the basis for the Board's revocation decision. Accordingly, the superior court did not abuse its discretion in finding that Wideman had failed to demonstrate a basis for relief as to his claim that the second revocation hearing did not comport with the minimum due process requirements and Arizona law.

## II.   Due Process in Factual Findings During Revocation Proceedings

**¶44**       Due process also prohibits the state from acting arbitrarily and capriciously during revocation proceedings. *Broadhead*, 151 Ariz. at 42. "In Arizona, 'arbitrary action' has been characterized as 'unreasoning action, without consideration and in disregard of the facts and circumstances.'" *Maricopa Cnty. Sheriff's Off. v. Maricopa Cnty. Emp. Merit Sys. Comm'n*, 211 Ariz. 219, ¶ 14 (2005) (quoting *Pima County v. Pima Cnty. Merit Sys. Comm'n*, 189 Ariz. 566, 568 (App. 1997)); *see also Morrissey*, 408 U.S. at 484 (requiring parole revocation be "based on verified facts" and "accurate knowledge of the parolee's behavior"). Our review of a state agency's factual conclusions is highly deferential. We review the record only to determine whether the Board's action evinces a disregard for the facts and circumstances. *Maricopa Cnty. Sheriff's Off.*, 211 Ariz. 219, ¶ 14. An agency has not acted arbitrarily in drawing conclusions from the facts "where there is room for two opinions, . . . even though it may be believed that an erroneous conclusion has been reached." *Tucson Pub. Schs., Dist. No. 1 v. Green*, 17 Ariz. App. 91, 94 (1972).

**¶45**       Wideman argues that the Board's revocation decision violated his substantive right to due process because it was arbitrary, capricious, and devoid of factual support. He further maintains that the superior court abused its discretion in concluding that the Board had a factual basis for its decision. In support of this argument, he contends the

Board "ignor[ed] the critical circumstances surrounding" Wideman's violation, "as well as [his] good faith efforts to comply."[13]

¶46        Applying the deferential standards set forth above, we conclude Wideman has failed to show that the Board acted arbitrarily or capriciously in revoking his parole. Instead, the record demonstrates the Board properly considered the evidence to reach the reasonable conclusion that Wideman had violated a condition of his parole and had lapsed or was about to lapse into criminal ways and company.

¶47        In the warrant, the Department wrote that Wideman had violated his parole "by failing to schedule an intake assessment with Dr. Jon McCaine, a licensed psychologist, on or about 07/18/2017, as verbally directed on 07/17/2017 by . . . Pogue." On that day, Wideman called McCaine's direct extension twice. When the calls went unanswered, Wideman left a voice message and subsequently called Pogue to report that he had made the calls to schedule an intake but was awaiting a return call from the doctor. Because no appointment was scheduled and a reasonable factfinder could conclude that a good-faith effort in scheduling an appointment requires more than leaving a message after calling the same number twice—particularly given the horrific nature of Wideman's crime, the emphasis he placed on obtaining continuing counseling from McCaine, and the extensive history of communications concerning the need to obtain

---

[13]Wideman additionally asserts that the revocation decision amounted to arbitrary action because it was "disproportionate to the single technical violation Wideman had committed." In support of this argument, Wideman cites a study by Middle Ground Prison Reform purportedly showing that other inmates that had committed more serious violations were nonetheless continued on supervision. However, this argument fails because the study is not meaningfully informative. As the Board notes, unlike Wideman, none of the offenders included in the study were convicted of murder. *Cf. Cooper*, 149 Ariz. at 185 (parole decision requires consideration of entire record, including gravity of offense). Moreover, the study accounts for only two variables—the commitment offense(s) and the warrant allegations—while ignoring the other considerations that may bear on a revocation decision. *See Broadhead*, 151 Ariz. at 42-43 & 42 (revocation requires "a violation and a showing of criminal recidivism"). Without this vital context, the study is inapt for reliable comparison and therefore cannot establish that the Board treated Wideman less favorably than others.

that counseling—we cannot say that the Board acted arbitrarily in finding that Wideman violated a term of his supervision.

**¶48** Wideman argues that he could not have made the appointment that day "because Dr. McCaine was out of the office." However, Wideman could have called the main office line to speak with another employee or attempted to reach McCaine via email or his cell, all of which were available to him. And even though McCaine advised Wideman of his preference to be contacted via his direct extension, that preference does not relieve Wideman of his obligation to make a good-faith effort to comply with his parole officer's directive through other available means of communication. Wideman also contends that any delay in scheduling was reasonable given Pogue's assurances that he was looking into CHC as an alternative. But Pogue's repeated references to McCaine in interactions with Wideman during the weeks leading up to the violation would have conveyed to any reasonable parolee the importance of promptly scheduling the appointment.

**¶49** Regarding lapse, the Board heard evidence that serious mental health issues had played a role in the murder Wideman committed and that those mental health issues became less severe due to the counseling he received while incarcerated. The Board also heard that Wideman had an established relationship with Dr. McCaine and that continued counseling with him was a critical component of Wideman's release. Despite this, Wideman told his parole officer that he could not afford sessions with McCaine and that his work schedule would not permit him to attend treatment with McCaine. On this record, the Board could reasonably conclude that Wideman was deliberately avoiding treatment with McCaine and therefore posed a risk of committing another crime. Thus, the Board had a sufficient basis to conclude that Wideman had lapsed or was probably about to lapse into criminal ways.

**¶50** Contrary to Wideman's assertion, the circumstances and efforts allegedly ignored by the Board were explicitly considered in its oral findings. The fact that Wideman reaches a different conclusion from the same evidence does not render the Board's decision arbitrary. *See Tucson Pub. Schs., Dist. No. 1*, 17 Ariz. App. at 94. We therefore cannot say the superior court abused its discretion in concluding that Wideman had failed to demonstrate a basis for relief as to his claim that the Board's revocation decision violated his right to due process because it was arbitrary. Likewise, the superior court did not err in concluding that the Board had a factual basis for its decision.

## III. Board Membership

**¶51**         Finally, Wideman argues that the superior court "erred in concluding the Board's membership did not impermissibly contain people of the same profession." He contends that "[t]hree out of the five board members"—Johnson, Quinonez, and Neal—"had law enforcement backgrounds," violating § 31-401(B), which prohibits "more than two members from the same professional discipline" from serving on the board at the same time.

**¶52**         Board member Johnson retired from the Phoenix Police Department as a homicide investigator in 1995 after twenty-one years of service. He later founded a security and investigation firm in 1996, served three terms (spanning from 2002 to 2013) on the Phoenix City Council, and co-founded a public-sector consulting firm. Security work and private investigation are not functions of law enforcement—a government function—and do not require experience or training in law enforcement. *See* A.R.S. § 32-2441 (listing requirements for private investigator registration applicants); A.R.S. § 32-2451 (prohibiting impersonation of public officers by private investigators). Politics and public-sector consulting are not law enforcement. Further, at the time of Wideman's second revocation proceeding, Johnson had spent over two decades away from law enforcement, and, thus, he cannot reasonably be considered to be from the law enforcement professional discipline. Moreover, adopting Wideman's narrow interpretation of the statute would make it nearly impossible to find qualified members for the board. *See State v. Barr*, 217 Ariz. 445, ¶ 20 (App. 2008) ("In construing statutes, we presume that the legislature did not intend an absurd result."). This is because § 31-401(B) additionally mandates that board members "demonstrate[] an interest in the state's correctional program," and the people most likely to meet that qualification are those who have at least some experience within the criminal justice system.

**¶53**         Wideman argues that characterizing Johnson as "not 'from' the law enforcement profession . . . contravenes the purpose of § 31-401(B), which is to ensure the board is made up of individuals with broad professional experiences." But this purpose would continue to be served by our interpretation of the statute given Johnson's significant experience as a business owner and public servant. Wideman also suggests that, under this reading of the law, "a person would no longer be 'from' a profession so long as he or she . . . has experience in other fields." This argument misses the mark. Our determination that Johnson is not from the law enforcement

professional discipline is not dependent on the fact that he has some experience in a separate field but that he has extensive experience in another field and had not worked in law enforcement for over two decades prior to the proceeding.

¶54　　　　Because Johnson does not come from the law enforcement professional discipline, at most two members come from the same professional discipline. Thus, the Board's composition complies with the requirements of § 31-401(B), and the superior court did not err in so concluding.

¶55　　　　Finally, our dissenting colleague purports to present a plain language analysis of "professional discipline" that supports Wideman's position. Under his interpretation, however, anyone who has *ever* been employed by a law enforcement agency, in any capacity, is from the professional discipline of law enforcement. Further, and by way of example, applying our colleague's approach would mean a criminal defense attorney who worked as a police officer before going to law school would be considered to be from the professional discipline of law enforcement. Our colleague's plain language analysis is unworkable.

## Disposition

¶56　　　　For the foregoing reasons, we affirm the superior court's denial of Wideman's second special-action petition.

E C K E R S T R O M, Judge, dissenting:

¶57　　　　In this case, the Board has revoked a parolee's release based on its finding of a single alleged violation: the parolee's lack of success in securing an appointment from a psychologist on a particular day. It has done so in the context of a record demonstrating that the parolee had complied with all other terms of parole for eight months and had dutifully participated in all prior counseling as directed by the Department.

¶58　　　　As to the specific violation alleged in the warrant, we must assess the Board's finding in the context of the following undisputed facts: (1) the parolee, Jacob Wideman, attempted to contact the psychologist twice by phone on the day in question and left a message seeking an appointment after the second call; (2) those calls conformed to the method for further contact specifically requested by the psychologist himself; (3) after Wideman was unable to make direct contact with the psychologist, he promptly contacted the parole officer to report the steps he had taken to

comply with the directive; and (4) the parole officer responded that Wideman's efforts were "perfect."

¶59        In short, the very parole officer who had directed Wideman to make an appointment signaled to Wideman that he had sufficiently complied. I therefore struggle to surmise how any construction of those events could constitute a violation of that directive. Nor can I agree that the Board that made this counter-factual finding was lawfully composed pursuant to A.R.S. § 31-401(B). Finally, the majority narrows the scope of a preliminary hearing for parole revocation proceedings by requiring a determination of probable cause as to only one of the two necessary bases for continued detention under Arizona law. In so holding, it defies the due process requirements for such hearings as articulated by the United States Supreme Court in *Morrissey v. Brewer*, 408 U.S. 471, 486-87 (1972). For each of these reasons, as shall be explained more fully below, I cannot join in affirming the revocation of Wideman's release.

## I.  Lack of Factual Basis for Finding of Violation

¶60        A "parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole." *Morrissey*, 408 U.S. at 479. That liberty interest entitles parolees to the due process protections of the Fourteenth Amendment during revocation proceedings. *Id.* at 481-84; *Broadhead v. Ariz. Bd. of Pardons & Paroles*, 151 Ariz. 37, 40 (App. 1986), *disapproved on other grounds by Kelley v. Ariz. Dep't of Corr.*, 154 Ariz. 476, 479-80 (1987). Due process not only entitles parolees to the core procedural ingredients of a fair hearing, it also prohibits state agencies from acting arbitrarily or capriciously during those proceedings. *Maricopa Cnty. Sheriff's Off. v. Maricopa Cnty. Emp. Merit Sys. Comm'n*, 211 Ariz. 219, ¶ 17 (2005) (applying standard to state administrative agencies generally); *Broadhead*, 151 Ariz. at 42 (applying standard to parole revocation proceedings specifically).

¶61        "In Arizona, 'arbitrary action' has been characterized as 'unreasoning action, without consideration and in disregard of the facts and circumstances.'" *Maricopa Cnty. Sheriff's Off.*, 211 Ariz. 219, ¶ 14 (quoting *Pima County v. Pima Cnty. Merit Sys. Comm'n*, 189 Ariz. 566, 568 (App. 1997)); *see also Morrissey*, 408 U.S. at 484 (requiring parole revocation be "based on verified facts" and "accurate knowledge of the parolee's behavior"). Judicial review of the Board's factual conclusions is highly deferential. We review the record only to determine whether the Board has acted without due attention to the facts and circumstances before it. *Maricopa Cnty. Sheriff's Off.*, 211 Ariz. 219, ¶¶ 13-14. For this reason, as my colleagues

correctly observe, an agency has not acted arbitrarily in drawing conclusions from the facts "where there is room for two opinions." *Tucson Pub. Schs., Dist. No. 1 of Pima Cnty. v. Green*, 17 Ariz. App. 91, 94 (1972).

**¶62**    Both due process and Arizona statute require a finding that the parolee has, at minimum, committed a violation of his parole before the state may revoke his release. *See Morrissey*, 408 U.S. at 484-88 (due process requires finding of violation to revoke); *Broadhead*, 151 Ariz. at 42 (Arizona statute requires both finding of violation and of lapse to justify revocation of parole). And, as explained above, due process further requires that any such finding have a basis in the record to support it. This is so, regardless of a parole officer's pre-existing expectations about a parolee's future performance or any board member's opinion about whether the parolee should ever have been granted parole.

**¶63**    In the warrant, the Department asserted that Wideman had violated his parole in only one respect—"by failing to schedule an intake assessment with Dr. Jon McCaine, a licensed psychologist, on or about 07/18/2017, as verbally directed on 07/17/2017 by [Officer] Pogue."[14] On the record before the Board, no reasonable factfinder could conclude that Wideman willfully or substantially violated that directive.

**¶64**    Instead, that record demonstrates Wideman took all the steps reasonably expected of him when he strived to schedule an intake assessment on July 18, 2017. On that day, Wideman called Dr. McCaine not once, but twice, to schedule an appointment. When the calls went unanswered, Wideman left a voice message seeking to schedule the appointment. These dispositive facts were corroborated both by McCaine and phone records. The Department does not contest them.

**¶65**    To ensure he had sufficiently complied with Officer Pogue's directive, Wideman called Pogue the same day to report that he had made the calls to schedule an intake but was awaiting a return call from the doctor. Pogue responded, "[P]erfect." That response would suggest to any reasonable parolee that he had complied with the directive to his parole

---

[14]This was also the lone violation asserted by the Department during the preliminary hearing and subsequent revocation hearing. *See Morrissey*, 408 U.S. at 486-87 (requiring parolee to be provided notice of "what parole violations have been alleged" before preliminary hearing). The warrant was the only formal notice the Department provided Wideman before his preliminary hearing as to any violation of parole he had committed.

officer's satisfaction—and that he could await the doctor's return call without violating the directive. This undisputed factual record of the interaction between Wideman and Pogue presents no room for differing opinions on whether Wideman had complied with Pogue's July 17 directive. *See Morrissey*, 408 U.S. at 479 ("[A] parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole."). Pogue's reply constituted the Department's confirmation and admission that Wideman had done so—a fact the majority fails to address in its analysis.

¶66 And, far from using Dr. McCaine's delay in responding as an excuse to delay counseling altogether, Wideman again inquired with Officer Pogue on July 19—the very next day—whether he could return to his previous counseling program with CHC. Pogue responded that the option would be staffed. That response, too, would lead any earnest parolee to believe that the Department was simultaneously evaluating other potential options for his continued counseling—and that the brief delay awaiting McCaine's response would therefore not violate the broader goal of the directive: for Wideman to continue counseling as soon as possible.[15]

¶67 The Department and the Board suggest several reasons why our record is nonetheless sufficient to support a differing opinion. First, they contend that Wideman could have done more to secure an intake appointment on July 18. They observe that Wideman had the option of contacting Dr. McCaine's front office staff and that Wideman also possessed McCaine's email address. But this overlooks that McCaine had specifically instructed Wideman how he wished to be contacted in light of Wideman's status as a parolee. McCaine had directed Wideman to leave a message at McCaine's direct extension—as Wideman did—rather than through the office's main line. Further, we must assess the adequacy of Wideman's actions in the context of his interactions with his parole officer on the day in question. As discussed, Officer Pogue plainly signaled that the efforts Wideman had undertaken were sufficient—indeed, "perfect."

---

[15]Wideman had previously, repeatedly expressed his concern to Officer Pogue that Dr. McCaine would be difficult to afford and that McCaine's only appointments available—all during the work week—would make it difficult to both retain his job and attend counseling. These were factors any parolee would reasonably assume to be highly relevant information to convey to his or her parole officer.

Nothing about that exchange would cue Wideman that he must try further avenues, including those his future therapist had expressly discouraged, to satisfy the parole officer's directive.[16] Under these circumstances, no reasonable factfinder could conclude that Wideman had violated the directive by failing to pursue additional avenues of contact. Here again, differing opinions on this point would be at odds with the undisputed facts: Wideman's pursuit of the other avenues was unnecessary because the very officer who had issued the directive conveyed that the efforts already taken were sufficient.

¶68        The majority's reasoning suggests we should evaluate the adequacy of Wideman's efforts on July 18 in the context of the persistent instructions he had received from Officer Pogue, occurring over the prior several weeks, that he secure counseling with Dr. McCaine. Indeed, several weeks earlier, Pogue had directed Wideman to make contact with McCaine "within the next week." But, this argument overlooks that, as Pogue acknowledged, Wideman did in fact contact McCaine within that week. At that time, Wideman reported to Pogue that McCaine had expressed practical concerns, which required additional follow-up, about both scheduling and insurance coverage.

¶69        Further, even if Wideman's lack of alacrity in securing an appointment could theoretically constitute a violation of parole, the Department's warrant charged Wideman only with violating the directive made on July 17 to schedule an appointment on July 18. The Department did not charge or notice Wideman with violating any directive issued before that time. Nor did the Department charge Wideman more broadly with a violation for being insufficiently enthusiastic about switching counseling to Dr. McCaine.[17]

---

[16]To the extent the Board suggests that Wideman technically violated the directive to make an appointment because Dr. McCaine had delayed in returning the July 18 message for several days, no reasonable factfinder could conclude that such a brief delay—caused by McCaine's actions, not Wideman's—would support a finding that Wideman had failed to substantially comply with his conditions of release.

[17]The Board also argues that, although Wideman persistently requested that he be allowed to continue counseling with the less expensive and more flexible CHC programming, "there is room for a different opinion that Wideman intentional[ly] delayed complying with the Department's directive." But nothing in the evidence suggests Wideman was

¶70 Finally, my colleagues posit that we should evaluate the adequacy of Wideman's efforts on July 18 in light of the emphasis Wideman had placed "on obtaining continuing counseling from [Dr.] McCaine" when he originally sought parole and during his subsequent status hearing. But, on the record before us, Wideman never questioned the Department's authority to insist that he transition to counseling with McCaine. Nor did he ever question McCaine's capability as a therapist. At the same time, the record amply explains why a well-intentioned parolee might come to believe that continued counseling with CHC would be more logistically feasible. Here, again, regardless of how we characterize those facts, the Department did not allege that Wideman's change of heart constituted a violation of his parole. For this reason, those facts do little to assist us in resolving whether Wideman did, or did not, comply with the Department's July 17 directive.

¶71 In short, no characterization of the record supports the Board's conclusion that Wideman violated the directive to schedule an appointment with Dr. McCaine on July 18, 2017. Given the absence of evidence supporting the Board's determination that Wideman had not complied with the terms of his supervision, we should conclude that the Board acted arbitrarily in making that finding. *See Maricopa Cnty. Sheriff's Off.*, 211 Ariz. 219, ¶ 14. That conclusion should dispose of the matter before us. *See* A.R.S. § 31-417; *see also Broadhead*, 151 Ariz. at 42-43 (Board must find parolee "delinquent" to revoke parolee's release; delinquency requires evidence of violation).

## II.  Lack of Evidence as to Lapse

¶72 Wideman also argues that the Board acted arbitrarily and capriciously in concluding he had lapsed or probably would lapse "into criminal ways or company." A.R.S. § 31-415; *see also Broadhead*, 151 Ariz. at 42-43 (Board must determine parolee both violated parole and lapsed to revoke release). The Department's case on lapse depended largely on its assertion that Wideman had violated the July 17 directive and that Wideman had thereby demonstrated a reluctance to secure counseling

---

demonstrating any reluctance to pursue further counseling when he simultaneously took steps to schedule an appointment with Dr. McCaine and persistently suggested an alternate counseling plan. Notably, the Department did nothing to signal that Wideman's alternate suggestion for counseling was unwelcome. To the contrary, Officer Pogue repeatedly informed Wideman that his request was being "staff[ed]."

pivotal to preventing further risks to the community. Its witnesses articulated no other evidence suggesting any other defects in Wideman's performance on release.

¶73        To the contrary, Officer Pogue conceded that he had received no negative reports about Wideman, and he acknowledged that Wideman had been a compliant home arrestee. Officer Dorman also acknowledged that, during Wideman's eight months of release, the Department had received no reports of Wideman engaging in any criminal activity or presenting with any anger or mental health issues. Indeed, Dorman testified that the Department's lone grievance with Wideman's performance during his release was his alleged delay in securing the appointment. Under such circumstances, I would conclude that the Board's finding of lapse should likewise be vacated given the lack of evidence supporting the crux of the Department's claim as to lapse—his alleged violation.[18]

## III. Due Process at Preliminary Hearing

¶74        Upon detention and arrest, due process entitles a parolee to a preliminary hearing. *Morrissey*, 408 U.S. at 485; *Broadhead*, 151 Ariz. at 40. The necessity of a preliminary hearing arises from concerns about the continuing detention of a parolee in the absence of a finding of probable cause by an objective hearing officer. *Morrissey*, 408 U.S. at 485. Accordingly, the purpose of the preliminary hearing is to "determine whether there is probable cause to hold the parolee for the final decision of the parole board on revocation." *Id.* at 487.

---

[18]In explaining why she believed Wideman was "probably about to lapse," Officer Dorman maintained her belief that Wideman's delay in securing the appointment demonstrated that he was "attempting to avoid" treatment. But, as the testimony of the parole officers demonstrated, Wideman persistently sought permission to attend other counseling at CHC—counseling previously endorsed by the Department itself—during the entire time he was attempting to schedule an appointment with Dr. McCaine. Such evidence, undisputed by the Department, contradicted Dorman's contention that Wideman was motivated to avoid treatment. For this reason too, the Department's erroneous claim that Wideman had committed a violation on July 18 was indispensable to the Board's finding on lapse.

¶75      That determination must occur in the context of "what parole violations" have been noticed and alleged.  *Id.* at 486-87.  In Arizona, the Department must notice and allege two species of violations to arrest and detain a parolee:  a violation of an express term of parole "and a showing of criminal recidivism."  *Broadhead*, 151 Ariz. at 42; *see also* § 31-415 (retaking warrant may only be issued if designated officer "has reasonable cause to believe that a paroled prisoner . . . has violated his parole . . . *and* has lapsed or is probably about to lapse into criminal ways or company") (emphasis added).  Further, our supreme court has expressly determined that parole may not be revoked absent a showing of both a violation and lapse. *Broadhead*, 151 Ariz. at 42-44 (revocation requires showing of "delinquency"; delinquency requires showing of both a violation and lapse).

¶76      The majority nonetheless concludes that the Department need only show a violation of one specific condition of parole—and not the second violation of lapsing into criminal ways or company—to continue to detain a parolee.  To support that conclusion, the majority implicitly characterizes a parolee's "lapse into criminal ways or company" as behavior distinct from a violation of parole.[19]  It observes that the *Morrissey* opinion exclusively used the word "violations" when describing the fact-finding requirements of a preliminary hearing.  *Morrissey*, 408 U.S. at 487.  And, it reads that language as narrowing the necessary scope of that inquiry to more specific species of violations than lapse.

¶77      That reading plucks a lone word out of its context.  A paragraph later, *Morrissey* clarifies that the purpose of a preliminary hearing is to "determine whether there is probable cause to hold the parolee for . . . revocation."  *Id.*  And, it proceeds to observe that such a determination must be "sufficient to warrant the parolee's continued detention."  *Id.*  Under Arizona's statutory standards, the Department must show *both* a specific violation of parole *and* behavior indicating lapse to warrant either detention or revocation.  § 31-415; *Broadhead*, 151 Ariz. at 42-43.

¶78      Further, *Morrissey* emphasizes that its procedural requirements for due process are general ones that must be applied in the context of specific state procedures.  408 U.S. at 488 ("We cannot write a

_____

[19]This reading stands at odds with the language used by the state in the conditions of parole signed by Wideman.  Those conditions make clear that the lapse into criminal ways or company would constitute a violation of parole.

code of procedure; that is the responsibility of each State."). As this reasoning makes clear, *Morrissey* did not purport to specify how any state must define those behaviors—or violations—that would form the necessary bases for revoking parole.

**¶79** By relieving the Department of its duty to present facts supporting each of the two statutory requirements for continued detention and potential revocation, the majority's reasoning undermines the purposes of the preliminary hearing as set forth in *Morrissey*: (1) to determine whether the state, by its own terms, has a sufficient basis for continued detention of the parolee and (2) to determine whether probable cause existed on all the grounds necessary to support a potential revocation at a subsequent hearing. 408 U.S. at 484-89.

**¶80** On the record before us, the hearing officer focused exclusively on the evidence of the violation as to the July 18 appointment. Meanwhile, it obstructed Wideman's efforts to factually explore and challenge the sufficiency of the Department's basis for the violation of lapse. The hearing officer repeatedly interrupted and constrained Wideman's questioning of Officer Dorman, one of the Department's primary witnesses and the supervising parole officer who had managed his case and issued the warrant. In doing so, the hearing officer explained that "the allegation" of "whether Mr. Wideman followed the directives of" Officer Pogue was his lone concern during the hearing and that the lapse language was just "verbiage" that appeared "on every single warrant that's issued."[20] In accordance with this approach, the hearing officer's findings failed to articulate or analyze any evidence of lapse.[21]

---

[20]Although Officer Dorman answered some questions and even indicated she had assessed whether Wideman was "probably about to lapse . . . by taking a totality of circumstances," the hearing officer prevented Wideman from asking further questions requiring Dorman to articulate those circumstances.

[21]These deficiencies ran afoul of the very concerns previously expressed by the superior court when it granted Wideman special-action relief, in part, on the basis that the Department had failed to provide Wideman a preliminary hearing in plain violation of *Morrissey* and *Broadhead*. In that order, the court emphasized the need of a preliminary hearing to explore whether the warrant was supported by *both* the allegation of a technical violation *and* by reasonable cause to believe a lapse had occurred or would occur. This court should insist that the Board and

¶81          In short, fundamental principles of due process, held applicable to parole revocation proceedings by the United States Supreme Court, required the Board to conduct a preliminary hearing on the Department's warrant to revoke release. *Morrissey*, 408 U.S. at 484-89. During that hearing, the hearing officer failed to provide any meaningful process for factually noticing, exploring, challenging, or articulating the evidence of lapse—one of the two required showings necessary under Arizona statute and jurisprudence for continued detention.  § 31-415; *Broadhead*, 151 Ariz. at 42.  Indeed, the hearing officer wholly obstructed Wideman's right to confront and cross-examine the Department's witnesses who possessed information germane to the issue.  This deprived Wideman of a fair opportunity to confront or challenge whether a sufficient basis existed to continue his detention and to proceed to a revocation hearing—the core purpose of the preliminary hearing.  *Morrissey*, 408 U.S. at 487.  In these respects, the conduct of the preliminary hearing plainly violated Wideman's right to due process.[22]

_____

the Department treat the necessary due process components of parole revocation hearings set forth in *Morrissey*—and applied by the superior court in its remand order—as more than mere suggestions; indeed, they are requirements for those proceedings.  And, this court should find it more unsettling that the hearing officer proceeded to accept and consider only evidence on the question of violation in apparent defiance of the superior court's order.

          [22]The majority concludes that any procedural defects in the preliminary hearing were cured by the revocation hearing.  That conclusion overlooks how the revocation hearing was conducted.  At that hearing, Wideman was again obstructed from cross-examining witnesses or comprehensively presenting evidence on the question of lapse until *after* the Board had already found Wideman delinquent (a finding that requires consideration of both a violation and lapse).  *See Broadhead*, 151 Ariz. at 42. In short, Wideman was allowed to present evidence that he had not lapsed only in mitigation of the Board's previous finding of delinquency.  This allowed the Board to treat the question of lapse as one of the totality of circumstances bearing on the appropriate consequence for his delinquency, rather than as a fact-finding indispensable to finding delinquency.

## IV. Lawful Composition of the Board

**¶82**      Wideman also contends that the Board was not lawfully composed when it revoked his parole.  In addressing this question, we must apply A.R.S. § 31-401(B).  That section provides in pertinent part:

> Each member shall be appointed on the basis of broad professional or educational qualifications and experience and shall have demonstrated an interest in the state's correctional program.  No more than two members from the same professional discipline shall be members of the board at the same time.

Wideman maintains that three members of the Board shared the professional discipline of having been trained and employed in law enforcement.  As the majority acknowledges, the merit of that claim turns on whether Board Member Johnson can be correctly viewed as being from the "professional discipline" of law enforcement.

**¶83**      When interpreting statutes, we must start with the text.  *State v. Serrato*, 259 Ariz. 493, ¶ 9 (2025).  We interpret that text not to shed light on potential legislative intentions but rather to determine and apply the plain meaning of the words the legislature ultimately chose.  *State v. Marner*, 261 Ariz. 275, ¶ 19 (2026) (adopting concurring opinion in *State ex rel. Ariz. Dep't of Revenue v. Tunkey*, 254 Ariz. 432, ¶¶ 26-27 (2023)).  If that text is clear and unambiguous, we are bound by that language unless it results in an absurdity or a constitutional violation.  *4QTKIDZ, LLC v. HNT Holdings, LLC*, 253 Ariz. 382, ¶ 5 (2022).

**¶84**      Here, § 31-401(B) plainly prohibits more than two members from the same "professional discipline" from serving contemporaneously on the board.  In this context, the word "discipline" connotes "a field of study."  *See Discipline*, Merriam-Webster, https://www.merriam-webster.com (last visited June 19, 2026).  And, as this court has previously explained, a "professional" is one who necessarily possesses "a high level of training and proficiency" in a particular vocation.  *See W. Corr. Grp., Inc. v. Tierney*, 208 Ariz. 583, ¶ 17 (App. 2004) (quoting *Professional*, Black's Law Dictionary (7th ed. 1999)).  Thus, under the ordinary meaning of the words our legislature has chosen, a person is understood to be from a "professional discipline" when he or she possesses a high level of training and proficiency in a particular professional field.  *See* § 31-401(B).

¶85        To the extent statutory language may be ambiguous in application, our understanding should also be informed by its context. *Nicaise v. Sundaram*, 245 Ariz. 566, ¶ 11 (2019); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) (statutes should be read "to consider the entire text, in view of its structure and of the physical and logical relation of its many parts"). In the sentence immediately preceding the text at issue—a sentence similarly addressing the requirements for board appointment—§ 31-401(B) directs that board members shall be appointed "on the basis of broad professional or educational qualifications and experience." *See* § 31-401(B). In this context, we must read the term "professional discipline" to refer to an applicant's training and proficiency in fields that, understood broadly, reflect professional qualification and experience pertinent to serving on the board.

¶86        On the undisputed record before us, Board Member Johnson clearly possesses a high level of training and proficiency in the field of law enforcement. He worked for twenty-one years as a law enforcement officer. Based on his experience and training, he climbed to the distinguished rank of detective and thereafter marshalled that expertise to found a private security and investigation firm. That expertise occupies no trivial part of Johnson's resume as a whole. Rather, it describes a substantial portion of Johnson's vocational history and constitutes an important professional qualification to serve on the Board. By any measure, then, Johnson's "broad professional or educational qualifications and experience" for the post of board member prominently included the "professional discipline" of law enforcement.

¶87        As the majority's reasoning emphasizes, a future applicant's resume might well trigger an authentic dispute regarding how much education, training, and experience would be necessary to fairly fall within a pertinent "professional discipline." But, as discussed above, both the definition of the term provided in our prior case law and the dictionary definitions that case cites, provide us workable standards to apply that language in future cases. *See Tierney*, 208 Ariz. 583, ¶ 17 (quoting *Professional*, Black's Law Dictionary (7th ed. 1999)). I respectfully submit that Board Member Johnson's resume does not present us with a close question in this respect.

¶88        Rather, the plain language of § 31-401(B) allows only one conclusion: Board Member Johnson—like fellow Board Members Quinones

and Neal[23]—was from the professional discipline of law enforcement. The Board was therefore unlawfully composed at the time it presided over Wideman's revocation proceedings.

¶89        The majority nonetheless concludes that Board Member Johnson cannot be characterized, for the purposes of the statute, as a person who hails from the professional discipline of law enforcement. It reasons that Johnson had not worked as a police officer for many years preceding his appointment and that Johnson's pre-appointment career arguably included other, more recent, professional disciplines as well.[24]

¶90        But these refinements to the meaning of the term "professional discipline" have no mooring in either the text or the manifest purpose of the statute we must apply. Nothing in the definition of the words "professional" or "discipline"—or in the language articulating the general qualifications for an applicant—place any temporal conditions on when an applicant must have acquired their expertise within the pertinent profession.

¶91        Nor does that text limit its application to those members who have training in only one pertinent professional discipline. In adding that caveat to the statute's application, the majority would allow the governor to justify the appointment of three or four persons from the same primary professional discipline if any one or two of them could plausibly present a second professional discipline on their resume. Such a reading would provide a governor with a loophole to stack the board with one dominant

---

[23]Board Member Quinones served twenty-seven years in federal law enforcement, retiring only a few years before his appointment. Board Member Neal retired as a crime scene investigator for the Glendale Police Department.

[24]In calculating the length of Board Member Johnson's retirement from the professional discipline of law enforcement and the diversity of Johnson's other vocations, the majority implies a statutorily relevant distinction between Johnson's career as a police officer and his subsequent vocation as a security consultant and private investigator. That reasoning overlooks that a person can develop and display professional expertise in law enforcement both as a publicly employed policeman and as a consultant in the private sector. Nothing in the language of § 31-401(B) suggests we make any distinctions between those specific vocations that display such expertise.

perspective, markedly undermining the plain purpose of the clause: to require an authentic diversity of professional backgrounds—and resulting perspectives—for the five voting members of the board. *See Morrissey*, 408 U.S. at 489 (requirement of neutral, detached hearing body as basic component of due process). In adopting that reading, the majority imposes a crippling limitation on the effectiveness of the statute in the absence of any textual basis for doing so.

¶92            Far from articulating any such narrowing refinements to the statute's application, the legislature has instead employed terse, general language to define an attribute of an appointee's background that no three board members can share: the same "professional discipline." *See* § 31-401(B). And, in the preceding sentence, it has likewise directed us to consider an applicant's qualifications and experience—that can often describe a professional discipline—from a broad perspective. *See* § 31-401(B). When a legislature has chosen general words, we must give those words their general meaning. *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* at 101 ("[T]he presumed point of using general words is to produce general coverage—not to leave room for courts to recognize ad hoc exceptions.").

¶93            As a matter of public policy or administrative convenience, some might prefer the limitations on the general application of the statute conjured by my colleagues. But they are not limitations adopted—either expressly, contextually, or implicitly—by its plain language. *See Roberts v. State*, 253 Ariz. 259, ¶ 20 (2022) (foundational rule of statutory interpretation that courts should not "read into a statute something which is not within the manifest intention of the legislature as gathered from the statute itself" (quoting *City of Phoenix v. Donofrio*, 99 Ariz. 130, 133 (1965))).

¶94            The majority opinion lastly maintains that applying the definition of the term "professional discipline," without extra-textual refinement, would undermine the purposes of the statutory language and thereby create an absurd result. It correctly observes that § 31-401(B) mandates that board members "demonstrate[] an interest in the state's correctional program." It then posits that "the people most likely to meet that qualification are those who have at least some experience within the criminal justice system." It therefore concludes that applying the term "professional discipline" to all pertinent professional disciplines prominently referenced in an applicant's background would render it "nearly impossible to find qualified members for the Board."

¶95        This reasoning overlooks that there are many citizens who have no previous experience within the criminal justice system, but who possess interest and pertinent qualifications arising from other professional disciplines.  For example, those who have a keen interest in human redemption, rehabilitation, or preventing recidivism—such as clerics, psychologists, social workers, or academics interested in penology—can readily provide the diversity in professional backgrounds that the statutory language was designed to foster.

¶96        The majority's reasoning also overlooks that there are many professionals with "experience within the criminal justice system" whose interest and expertise do not arise from the professional discipline of law enforcement.  This would include retired judicial officers, victims of criminal acts, victims' rights advocates, criminal defense attorneys, and even reformed former convicts.  Persons from all of these varied backgrounds might possess both the broad qualifications and interest to qualify as board members.  In that context, the majority's debatable assertion—that the plain language application of § 31-401(B) would make it nearly impossible to recruit willing and qualified board members—falls far short of demonstrating any absurdity sufficient to justify altering the reach of the statute's plain language.  *See* Scalia & Garner, *Reading Law:  The Interpretation of Legal Texts* at 237 (application of absurdity doctrine appropriate only when doing otherwise would require outcome "that no reasonable person could intend").

¶97        For the foregoing reasons, I would hold that the Board was unlawfully composed when it presided over Wideman's revocation proceedings.  In my view, the majority's contrary conclusion defies settled norms of the "plain language" statutory interpretation that our supreme court has instructed us to apply.  *See Tunkey*, 254 Ariz. 432, ¶¶ 23-32.  It does so by elevating its own preferences for the application of § 31-401(B)— however wise and practical they might be—above the language and purposes of that text.

**V.  Conclusion**

¶98        In addressing the several important issues before us, we must be mindful that this court's opinion calibrates the standards for how Arizona's Board of Executive Clemency will function in future cases.  Will future boards conduct themselves in conscientious conformity with the settled requirements of due process set forth by the United States Supreme Court in *Morrissey* and fostered by Arizona statute?  Specifically, will the board's decisions be rigorously anchored in the facts regarding a parolee's

actual performance on parole as required by those minimal standards? Or, by contrast, will a parole officer's intuitions about the parolee's character, in light of the parolee's original crime, alone constitute adequate grounds for revocation? Will future boards dutifully base their procedures and deliberations on *all* the statutory predicates for the revocation of parole—rather than just one of them? Will governors compose future boards in earnest conformity with Arizona's statutory scheme for fostering a hearing body that includes a range of authentically diverse perspectives?

**¶99** I fear the majority opinion has failed to firmly enforce any of these standards in the case before us. I worry this will signal future governors and boards that they need not rigorously comply with them. I therefore respectfully dissent.